

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

**TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed May 9, 2007                                                                      **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| In Re: § | |
| § | |
| General Electrodynamics Corporation, § | Case No. 06-40208-DML-11 |
| § | |
| Debtor. § | |

### MEMORANDUM OPINION

Before the court is the "*First Amended Plan of Reorganization, Proposed by General Electrodynamics Corporation*" as modified by the "*Second Amendment and Supplement to Debtor's First Amended Plan of Reorganization*" (the "Plan")[1] filed by the above named Debtor (sometimes "GEC"). The court held a confirmation hearing respecting the Plan (the "Hearing") over 4 days on October 17, November 8, November 13, and November 14, 2006. During the Hearing, the court heard testimony from Debtor's president, Dick E. Davis ("Davis"); Debtor's chief operating officer, James Emmons ("Emmons"); Bryant Needham ("Needham") an economist who testified as to interest rates on behalf of Debtor and who was called by Esequiel Sanchez ("Sanchez") to rebut valuation testimony of Christopher J. Kelly ("Kelly") who was

---

[1] For the purposes of this memorandum opinion the court assumes all amendments and supplements to the Plan satisfy the requirements of section 1127 of the Bankruptcy Code (11 U.S.C. § 101 et. seq.; hereafter the "Code") or, if applicable, Fed. R. Bankr. P. 3019.

called by Debtor as a valuation expert; and (by video deposition) Harold Thomas. The court also received into evidence exhibits identified as necessary below.[2]

Following the Hearing, Debtor and Compass Bank ("Compass") filed briefs in support of confirmation. Sanchez filed a brief in opposition to confirmation.

This matter is subject to this court's core jurisdiction pursuant to 28 U.S.C. §§ 1334 and 157(b)(2)(L). This memorandum opinion constitutes the court's findings of fact and conclusions of law. Fed. R. Bankr. P. 7052 and 9014. Much of the transcript of the Hearing was placed under seal at Debtor's request in order to protect against disclosure of information respecting a business opportunity being pursued by Davis; in part in recognition of that request, the court directs below that this memorandum opinion be placed under seal pending further order of the court. Parties receiving copies of this memorandum opinion (as set forth below) are directed and cautioned to act accordingly.

## I. BACKGROUND

GEC is in the business of producing and marketing devices for weighing aircraft and trucks. Compass is GEC's principal secured lender and is owed approximately $800,000. Although possessed of a checkered history,[3] GEC appears currently to be profitable.

On December 30, 2005, Sanchez obtained a judgment against GEC in the amount of $1,439,490[4] (the "Judgment").[5] GEC appealed the Judgment, but the appeal is stayed pursuant

---

[2] J. Douglas Cortes was appointed as examiner in this case. His duties were limited to investigation and reporting, and his final report is also before the court.

[3] Davis testified that he first acquired GEC (actually a predecessor of the same name) in 1978, at a time when it was losing money (Transcript of Hearing, Oct. 17, 2006, p. 62, ll. 8-24). Davis sold the company in 1995 (*Id.*, p. 163, l. 25). In 2000, Davis acquired the bank note secured by the prior GEC's assets and so obtained the assets owned by Debtor. (*Id.*, pp. 164, l. 23, 165, l. 5). In 2001, Davis resumed operations through Debtor (*Id.*, ll. 6-16).

[4] Sanchez and Debtor have stipulated that, for purposes of confirmation of the Plan (including whether it satisfies Code § 1129(a)(11)), Sanchez has a claim of $1,100,000, but the parties do not agree as to how the stream of payments are to be structured and further do not agree on whether the Plan meets the requirements of Code § 1129(b)(2)(B)(i). While the court has some doubt about whether it is appropriate to limit consideration of feasibility of the Plan under section 1129(a)(11) as required by the parties' stipulation, given that distributions under the Plan will ultimately have to satisfy Sanchez's claim in its actual allowed (possibly greater) amount, it will accept the stipulation for purposes of this memorandum opinion.

Memorandum Opinion - Page 2 of 19

to Code § 362(a)(1),[6] and the parties estimate that substantial costs will be incurred and substantial time will pass before all proceedings respecting the Judgment are concluded.

Rather than posting a bond to avoid execution against it on the Judgment, GEC commenced this chapter 11 case. The Plan proposes to pay Sanchez 100% of his claim, if any, once appeals of the Judgment are exhausted. Pending conclusion of appeals, however, Sanchez is to receive no distributions on his claim.[7] Following confirmation Debtor proposes no immediate escrow of funds from its operations against the Judgment and candidly admits its cash flow would not allow for such an escrow. The projections testified to by Kelly (Debtor's Exhibit 18) do not allow for distributions to (or escrow of funds for the benefit of)[8] Sanchez until September 2008.

Under the Plan, Sanchez is classified separately from other unsecured creditors.[9] All classes other than that of Sanchez have accepted the Plan. Sanchez has rejected the Plan.

## II. DISCUSSION

### A. *Alternatives to the Plan*

Debtor and Compass argue that the only alternative to the Plan is Debtor's liquidation. In such a liquidation, unsecured creditors, including Sanchez, would, at best, they assert, receive a

---

[5] Davis was also sued by Sanchez, but only a small part of the Judgment was assessed against him. Davis cash-bonded around his share of the Judgment, using funds made available by GEC. Those funds ($100,000 approximately) figure in the Plan, as discussed below.

[6] By order dated April 13, 2006, the court modified the stay to allow Sanchez to file a cross-appeal. The court is unaware, based on the record of this case, whether the parties are proceeding with the appeal notwithstanding section 362(a).

[7] The Plan (as now before the court), proposes release of the cash bond posted on Davis's behalf and offers Sanchez the option, subject to certain conditions, of receiving that amount — $100,000 — immediately. *See* Plan ¶ 4.7(b)(vii).

[8] If Sanchez does not elect to take immediate distribution of the cash bond posted on behalf of Davis, the cash bond will be escrowed against interest accruing under the Plan on Sanchez's claim. This fund would cover interest on Sanchez's claim (in the stipulated amount) for a little more than one year.

[9] Unsecured claims of $423,274 have been filed in addition to Sanchez's claim. These other unsecured claims are divided into two classes: small claims and larger claims. The latter class is to be paid out over 60 months (as opposed to the 72 month term for Sanchez's claim) at the same 9% interest rate proposed for Sanchez.

tiny dividend. Sanchez, on the other hand, insists Debtor could be sold as a going concern, either pursuant to a chapter 11 plan or by a chapter 7 trustee, who, Sanchez posits, would be able to operate Debtor's business under Code § 721.

The court is of the opinion that, in the absence of a plan satisfactory to Debtor, liquidation under chapter 7 is the only realistic alternative in this case.[10] In attacking the treatment of his claim under the Plan, Sanchez makes much of the fact that (1) Davis is of an age such that he may not live long enough for Debtor to complete the payments to Sanchez called for by the Plan; (2) Neither Davis nor Emmons nor any of Debtor's other employees have entered into (or, pursuant to the Plan, will be required to enter into) employment agreements or agreements not to compete with Debtor; and (3) Davis and other of Debtor's employees could elect at any time to abandon Debtor, thus mooting the Plan, and operate a business identical to Debtor's elsewhere.

Just as these factors make the Plan unattractive for Sanchez, they make successful marketing of Debtor as a going concern during further chapter 11 proceedings unlikely. As to the alternative of sale by a chapter 7 trustee authorized to operate Debtor's business under section 721, even assuming the court would authorize such operations,[11] it is even less likely that Davis and Debtor's other employees would serve a chapter 7 trustee in such circumstances than that they would cooperate in a sale under a chapter 11 plan. Moreover, the court finds persuasive

---

[10] Although the court need only test a plan against the alternative of liquidation for purposes of confirmation (section 1129(a)(7)), Sanchez repeatedly urged the court during the Hearing to consider Debtor's marketability.

[11] Code § 721 provides:

> The court may authorize the trustee to operate the business of the debtor for a limited period, if such operation is in the best interest of the estate and consistent with the orderly liquidation of the estate.

Even if the court determined operation of Debtor's business in chapter 7 was appropriate under this provision, there would remain the question of whether Compass would acquiesce in such relief. Assuming the chapter 7 trustee could operate with the inflexible funding afforded through use of just cash collateral, under Code § 362(d)(2), it is probable Compass would be entitled to relief from the automatic stay and so would be able to foreclose upon its cash collateral and virtually all Debtor's other assets.

Memorandum Opinion - Page 4 of 19

the testimony of Emmons, Davis and Kelly[12] that there are no likely buyers who would be prepared to pay a price for Debtor sufficient to provide a meaningful return to unsecured creditors.

Because liquidation of Debtor would provide much worse treatment to Sanchez (and other creditors) than does the Plan, because sale of the Debtor as a going concern is not practicable and because Debtor provides a benefit to the community through the payroll it supports, Debtor and Compass argue that the Plan should be confirmed. The alternative of lost jobs and destruction of a profitable company, they insist, must be avoided; ergo, the court must rule in favor of confirmation.

Unfortunately, the Code does not provide the court with the authority to confirm a plan simply because it is better for an objecting creditor than is the alternative. Similarly, the Code makes no provision for the court to override the requirements of confirmation in favor of the public interest or on the basis that support for the Plan by creditors other than Sanchez is overwhelming. On the contrary, the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), in which Congress undertook a thorough revamping of the Code, evidences no legislative concern for the public interest or the interests of employees or creditors generally.[13] Instead, Congress enacted provisions favoring special classes of creditors to the exclusion of all other considerations. Thus, in amending, for example, sections 365, 366 and 1121 of the Code, Congress has, presumably intentionally, made chapter 11 much less suitable as a remedy than it was before BAPCPA became effective. Companies such as Kmart, Mirant

---

[12] Transcript of Hearing, Oct. 17, 2006, p. 75, ll. 23 ff; p. 225, ll. 2 ff, and Transcript of Hearing, Nov. 13, 2006, p. 74, ll. 7 ff, and p. 90, ll. 24 ff.

[13] Where Congress has wished the courts to consider the public interest it has said so. *See, e.g.*, Code § 1165. Likewise, where Congress has felt it appropriate, it has given weight to the interests of employees. *See, e.g.*, Code §§ 507(a)(4) and 1113. While the court, in some contexts, may be able to take the public interest into account in the absence of specific statutory authority, (*see, e.g., Mirant Corp. v. Potomac Elec. Power Co.* (*In re Mirant Corp.*), 378 F. 3d 511, 524 (5th Cir. 2004)), it must still adhere to the specific terms of the Code.

Corp. and United Airlines, all of which have survived through use of chapter 11, very likely could not restructure effectively under the Code since the passage of BAPCPA.

It would be singularly inappropriate, therefore, for the court to import into chapter 11 an overriding test for confirmation based on the court's views of Sanchez's best interest (as opposed to that creditor's) or based on the public interest or the needs of a debtor's employees. Certainly if Congress is prepared to see companies like Kmart (which at the time of its chapter 11 filing employed 250,000 workers) collapse at the whim of their landlords, there is no reason to think Congress would care if the strict requirements it has enacted for confirmation of chapter 11 plans should lead to the demise of GEC. Put another way, if the Plan does not meet the requirements of section 1129 of the Code, then the court may not confirm it, however disastrous the consequences for Sanchez, other creditors and the community at large.

The court must administer the Code according to its terms. The role the public interest or the needs of creditors or a debtor's employees should play in plan confirmation must be left to Congress. As Congress has structured the Code, the court, in its decision whether to confirm the Plan, has no authority to substitute its views of what is best for Sanchez for his own; he has an absolute right under the law to shoot himself in the foot.

### B. *Requirements for Confirmation*

    1. Requirements other than Feasibility

        a. *Section 1129(a)*

Section 1129(a) of the Code establishes 16 tests for confirmation of a plan of reorganization. In the case at bar, the Plan does not meet the test established by section 1129(a)(8) which requires either that each class of claims or interest must be unimpaired or that the holders of the claims or interests in the classes have, by the requisite majorities, accepted the Plan. Sanchez, whose claim is classified by itself, voted to reject the Plan. There is no dispute

that his claim is impaired.

As to the remaining tests of section 1129(a) (other than the feasibility requirement of section 1129(a)(11)), the court finds that each such test is either inapplicable or is met by the Plan, with the possible exception of the requirement of section 1129(a)(1) that the Plan comply with the applicable provisions of the Code. As to this requirement, certain provisions of the Plan such as the injunction protecting Nordic and Davis (really a channeling order) may not comply with the Code in the specific context of the Plan. The injunction (or channeling order), as proposed in this Plan, can only be consistent with section 524(e) of the Code if its effect is no more than to defer pursuit by Sanchez of Nordic or, more importantly, Davis pending full satisfaction of Sanchez's claim by Debtor. *See In re Artra Group, Inc.*, 300 B.R. 699, 704 (Bankr. N.D. Ill. 2003). Given its concerns regarding the likelihood of Sanchez's claim being so satisfied, which are set out below, the court is not now prepared to find the injunction to be permissible under section 524(e). On the other hand, because of its conclusion that the Plan is, in any event, not confirmable, neither will the court at this juncture hold that the Plan does not satisfy section 1129(a)(1) of the Code.

    b.    *Section 1129(b)*

Pursuant to Code § 1129(b)(1), the court may confirm a plan which meets all the requirements of section 1129(a) other than that of section 1129(a)(8) (i.e., that each class of claims and interests is unimpaired or has accepted the plan) if the court determines that the plan is fair and equitable and does not discriminate unfairly as to dissenting classes. A plan is deemed to be fair and equitable if it satisfies, as to any dissenting class, the applicable requirements established by section 1129(b)(2).

In the instant case, for the Plan to be fair and equitable it must, as to Sanchez's dissenting class, provide on account of his claim "property of a value, as of the effective date of the plan,

equal to the allowed amount of such claim." 11 U.S.C. § 1129(b)(2)(B)(i). For purposes of confirmation of the Plan the parties have stipulated that the allowed amount of Sanchez's claim is $1,100,000 and that accrual of interest on the claim at 9% will provide full present value of the claim.[14] The Plan, however, provides that Sanchez's claim will amortize negatively (except to the extent the $100,000 cash bond may be escrowed against interest) for approximately two years. Although not favored (*see In re McCombs Properties VIII, Ltd.,* 91 B.R. 907 (Bankr. C.D. Cal. 1988); *In re Sunflower Racing, Inc.*, 226 B.R. 673, 688 (D. Kan. 1998); *In re M & S Assocs., Ltd.,* 138 B.R. 845, 850 (Bankr. W.D. Tex. 1992); *In re Apple Tree Partners,* 131 B.R. 380, 395 (Bankr. W.D. Tenn. 1991); *In re Club Assocs.,* 107 B.R. 385, 398 (Bankr. N.D. Ga. 1989), *aff'd,* 956 F.2d 1065 (11th Cir.1992)),[15] courts have approved plans under section 1129(b)(2) that provide for negative amortization. *See, e.g., In re Club Assoc.,* 107 B.R. 385, 398 (Bankr. N.D. Ga. 1989) (confirming a plan under § 1129(b) despite negative amortization of secured claim; terms of original contract provided for negative amortization); *In re Consolidated Properties Ltd. P'ship*, 170 B.R. 93, 99 (Bankr. D. Md. 1994); *In re Bouy, Hall and Howard and Assoc.,* 141 B.R. 784, 790 (Bankr. S.D. Ga. 1992).[16] But confirmed plans that so provide typically involve a dissenting class of secured claims. Indeed, the court has found (and has been cited to) no case in which a plan that provided for negative amortization of a dissenting class of unsecured claims was confirmed pursuant to section 1129(b)(2)(B)(i). Thus, while the court would find, based on the testimony of Kelly and Needham, that the value as of the Plan's effective date of the

---

[14] Sanchez argues that irregular payments provided for in the Plan would prevent its treatment of his claim from complying with section 1129(b)(2)(B)(i).

[15] *See also Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1177 (9th Cir. 1992) (concluding that while most courts have been reluctant to adopt a per se rule against negative amortization, there are commonly held reservations about the practice).

[16] *See also In re D & F Constr. Inc.,* 865 F.2d 673, 676 (5th Cir. 1989) (refusing to hold that negative amortization will never be fair and equitable); *In re Apple Tree Partners, L.P.,* 131 B.R. 380, 395 (Bankr. W.D. Tenn. 1991) (rejecting *McCombs'* per se rule against negative amortization); *In re Orfa Corp. of Philadelphia,* 129 B.R. 404, 418 (Bankr. E.D. Penn. 1991) (deferral of interest not per se objectionable under 1129(b)); *In re Spanish Lake Assoc.,* 92 B.R. 875, 878 (Bankr. E.D. Mo. 1988) (rejecting *McCombs'* per se rule and listing elements to be considered on a case-by-case analysis of the fairness of negative amortization).

payments proposed for Sanchez's claim is $1,100,000, the court is not now prepared to hold that the proposed treatment of Sanchez's claim is fair and equitable and not unfairly discriminatory. Because of the court's finding respecting feasibility, there is no need to resolve at this time whether the Plan, because it negatively amortizes a dissenting class of unsecured claims, fails to satisfy section 1129(b).

2. Feasibility

Code § 1129(a)(11) requires that, in order for a plan to be confirmed, the court must find that:

> (11) Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.

Generally referred to as a requirement that a plan be feasible, section 1129(a)(11) mandates that a debtor satisfy the court that carrying out the terms of the plan, in the context of future operations, is not likely to force the debtor into liquidation or further reorganization proceedings. That a plan meets this test must (like all other requirements for confirmation) be proven by the plan's proponent by a preponderance of the evidence. *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 801 (5th Cir. 1997); *In re Danny Thomas Properties II Ltd. P'ship*, 241 F.3d 959, 963 (8th Cir. 2001); *In re Armstrong World Industries, Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *Corestates Bank, N.A. v. United Chemical Technologies, Inc.*, 202 B.R. 33, 45 (E.D. Pa. 1996).

In the case at bar, Debtor has failed to meet this requirement. As Debtor argues, it was not required to show certainty that the Plan is feasible. *Fin. Sec. Assurance, Inc. v. T-H New Orleans Ltd. P'ship*, 116 F. 3d 790, 801 (5th Cir. 1991). That certainty is not required does not equate, though, to giving the Debtor the benefit of every doubt nor does it shift to Sanchez the burden to show that the Plan is *not* feasible.

Memorandum Opinion - Page 9 of 19

Debtor admits in its post-hearing brief that its projections are "tight." The court would go further. Debtor's projections reflect that payments on Sanchez's claim will result in a number of years in which the Debtor will have a negative cash flow (Debtor's Exhibit 18; testimony of Kelly, Transcript of Hearing, Nov. 13, 2006, p. 92, ll. 6 ff). Kelly testified (*id.* p. 94, ll. 2 ff) that there were a number of ways Debtor could handle these shortfalls — *e.g.*, additional borrowing or deferring trade payables. If the court had sufficient confidence in Kelly's projections, it might be prepared to put Sanchez to the risk that Debtor would be unable to overcome these projected cash deficiencies. But Kelly did not instill such confidence. Both Kelly's testimony and the testimony of Needham elicited by Sanchez on rebuttal left the court with grave concern about the depth of Kelly's investigation and his methodology in projecting the results of Debtor's operations.[17] When uncertainties such as Davis's probable lifespan, the attraction for Davis of other opportunities, the possibility of Debtor's management defecting to a prospective competitor and the possible fluctuations always inherent in the economy are taken into account,[18] the court cannot find that Debtor has carried its burden; confirmation of the Plan will, as likely as not, be followed by a need for further restructuring or Debtor's liquidation. Because the court

---

[17] The cross-examination of Needham revealed that Kelly may not have investigated new technologies (including new research or new products) which would arguably allow the Debtor to remain competitive. *See* Transcript of Hearing, Nov. 14, 2006, p. 51, ll. 9 ff. The cross-examination also revealed that Kelly may not have spoken with any industry experts to analyze the feasibility of making payments on the Sanchez claim. *See id.*, ll. 21 ff. In fact, Needham's testimony suggests that Kelly may not even posses the training necessary to conduct such analysis. *See id.*, p. 54, ll. 9 ff; pp. 55-56. While Sanchez has not objected to Kelly's status as an expert (*see Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993)), the court must consider the witness's adequacy as an expert in evaluating his testimony. *See Moore v. Ashland Chem. Inc.*, 151 F.3d 269, n.13 (5th Cir. 1998); *Edmonds v. Illinois Cent. Gulf R. Co.*, 910 F.2d 1284, 1287 (5th Cir. 1990). Given that Kelly surely may be presumed to have had in mind his client's agenda (*see In re Mirant Corp.*, 334 B.R. 800, 814 (Bankr. N.D. Tex. 2005); *In re Coram Healthcare Corp.*, 315 B.R. 321, 339 (Bankr. D. Del. 2004); *In re Excide Techs.*, 303 B.R. 48, 61 (Bankr. D. Del. 2003); *In re Becker Indus. Corp.*, 58 B.R. 725, 739 (Bankr. S.D.N.Y. 1986)), all these concerns must be taken to affect negatively the court's confidence in his projections.

[18] Although the court has accepted the parties' stipulation that Sanchez's claim is $1,100,000, Sanchez's judgment, in fact, substantially exceeds that amount. Should Sanchez's claim ultimately be allowed in an amount greater than $1,100,000, Debtor would face even greater difficulty in satisfying that claim over the term of the Plan. While the court concludes that the Plan is not feasible even if Sanchez's claim in fact is allowed for only $1,100,000, the risk that the claim might be allowed in a greater amount, notwithstanding the parties' stipulation, would otherwise weigh heavily against any finding of feasibility. The court need not, at this time, determine whether it could consider this risk despite the stipulation.

cannot find that the Plan meets the requirements of Code § 1129(a)(11), the Plan cannot be confirmed.

### III. CONCLUSION

Notwithstanding its determination that the Plan is not confirmable, the court is convinced that it is in the best interest of all parties, including Sanchez, that GEC survive. The court is thus reluctant to enter an order denying confirmation — an event that would likely be followed promptly by Debtor's conversion to chapter 7 and all the unfortunate consequences predicted by Debtor and Compass. Accordingly, the court will temporarily defer entry of an order consistent with this opinion. Rather, pursuant to Code § 105(d), Davis, Sanchez, their attorneys and counsel for Debtor are directed to attend a conference with the court to be held in chambers at 9:00 a.m. on December 27, 2006. In addition to those parties, Compass, Nordic and the United States trustee may, but are not required to attend such conference.

The clerk of the court is directed to transmit a copy of this memorandum opinion to counsel for each of the parties named in the preceding paragraph and J. Douglas Cortes, court-appointed examiner in this case. Except as here specified, this memorandum opinion shall be held under seal by the clerk pending further order of the court.

Entered: December 19, 2006

**ON MOTION FOR REHEARING; MOTION TO ESTIMATE CLAIM; OBJECTIONS TO CLAIM; AND APPLICATION FOR ALLOWANCE OF ADMINISTRATION EXPENSE**

Following entry of the foregoing memorandum opinion, Debtor filed its "*Fourth Amendment and Supplement to Debtor's First Amended Plan of Reorganization*" (the "Fourth Modification") and sought reconsideration based upon such modification of the court's determination that the Plan was not confirmable pursuant to Code § 1129(a)(11). The central

feature of the Fourth Modification is a capital infusion from Davis into Debtor[19] of $400,000.[20] Based (in part, at least) on indications from the court that the proposed capital infusion would resolve the court's concerns respecting feasibility of the Plan,[21] Sanchez withdrew his objection to confirmation of the Plan; Sanchez also filed his "*Motion for Estimation and Allowance of Unsecured Claim of Mr. Esequiel Juan Sanchez, III, for Distribution Purposes*" (the "Estimation Motion"), as a result of which Debtor and Sanchez agreed to a procedural order (the "Estimation Order") which the court entered on February 6, 2007. In addition to procedures established by the Estimation Order, pursuant to which the court was to determine the amount of Sanchez's claim based on appeal (and, potentially, remand) of the Judgment, Debtor filed its "*Debtor's Objection to Amended Proof of Claim of Esequiel Sanchez III*" (the "Claim Objection"), by which Debtor urged objections to Sanchez's claim on various bases independent of its appeal of the Judgment. Finally, Sanchez filed "*Esequiel Sanchez, III's Application for Allowance and Payment of Administrative Expenses*" (the "§ 503(b) Application"), pursuant to which Sanchez, under Code § 503(b), seeks payment of a part of his attorneys' fees incurred in this case.

The court heard argument respecting the Estimation Motion and received evidence on the Claim Objection and the § 503(b) Application on April 17, 2007. Having determined that the Plan, as modified, should be confirmed, the court, by letter ruling, resolved the Estimation Motion and Claim Objection[22] by allowing Sanchez's claim in the amount of $811,070

---

[19] The modification also provides certain other protections for Sanchez and (arguably) other creditors.

[20] Davis will make the infusion by one or more irrevocable letters of credit.

[21] The court's concerns respecting sections 1129(a)(1) and 1129(b)(2)(B) of the Code were tied to feasibility and so are also resolved by the Fourth Modification. The court thus can now find that the Plan (1) meets all tests under sections 1129(a) except that of section 1129(a)(8); and, (2) with respect to Sanchez (the sole dissenting class), satisfies section 1129(b)(1).

[22] Pursuant to the Estimation Order, the parties also asked that the court resolve their dispute respecting Davis's liability on the Judgment. The court (as reflected in its letter ruling) determined that there is no reason to revise any term of the Judgment respecting Davis.

(including $22,000 in prepetition attorneys' fees).[23] As directed in the Judgment, interest shall be calculated on that amount from January 20, 2006 to the date of the commencement of Debtor's chapter 11 case.[24]

Turning next to the § 503(b) Application, Debtor presents numerous arguments why that application should be denied or substantially reduced. Several of these arguments turn on the necessity that Sanchez show he has made in "substantial contribution" in the case[25]: Debtor denies that the "contributions" by Sanchez were substantial or benefited anyone but Sanchez.

---

[23] With the acquiescence of the parties, except as discussed below, the court determined that it would be counterproductive to provide its reasoning respecting disposition of the Estimation Motion or the Claim Objection. However, with regard to the contention in the Claim Objection that Sanchez's claim should benefit the creditors in his bankruptcy, as the court noted during the April 17 hearing, Sanchez's chapter 7 trustee is expected to reopen his case (over which this court has jurisdiction) pursuant to Code § 350 and then ensure that creditors (1) are noticed, as appropriate, pursuant to Fed. R. Bankr. P. 2002(f) and (h) and 3002(c)(5); and (2) receive distributions to the extent provided by Code § 726(a)(1)-(5).

The court does deem it appropriate to address one of the other grounds for the Claim Objection. Debtor contends that a claim it asserted in a suit by it against Sanchez and certain of his affiliates should be offset against Sanchez's claim. The claim asserted by Debtor, however, should have been pleaded as a counterclaim in the suit in which Sanchez obtained the Judgment (Sanchez was severed from the suit filed by GEC after he sought relief in this court). There is no question but that Debtor's claims against Sanchez arise from the same facts as those underpinning the Judgment and that, therefore, Debtor's potential counterclaims are compulsory. *See* Tex. R. Civ. P. 92(a); *Jack H. Brown & Co., Inc. v. Northwest Sign Co., Inc.*, 718 S.W.2d 397, 398 (Tex. App.—Dallas 1986, writ refused n.r.e.) (and cases cited therein). Even if Sanchez's bankruptcy interposed a stay that inhibited their assertion in the suit leading to the Judgment, relief from the stay could have been sought. Because the allegedly offsetting claims could and should have been urged in the state court, they are now precluded. *See, e.g., Jones v. First Nat. Bank of Anson*, 846 S.W.2d 107 (Tex. App.—Eastland 1992).

[24] Debtor asserts (and Sanchez does not contest) that Sanchez's claim should not bear interest from the date of case commencement to the effective date of the Plan.

[25] This court has recently had occasion to address the law under Code § 503(b)(4). *See In re Mirant Corp.*, 354 B.R. 113, 131-42 (Bankr. N.D. Tex. 2006). In that case the court cited the following factors which should be considered in evaluating whether a party has made a substantial contribution: (i) whether the applying party conferred a benefit on the estate, (ii) whether the services involved in the contribution were undertaken just for the applying creditor or for the benefit of all parties in the case, (iii) whether the applying party would have done the same thing absent the expectation of compensation from the bankruptcy estate, (iv) whether the benefit conferred exceeds the cost the party seeks to assess against the estate, (v) whether the services of the applying party are duplicative of those that were undertaken by statutory fiduciaries, (vi) whether the party profited from post-petition acquisition of claims, and (vii) whether the party engaged in improper conduct in the case. *Id*. Of these the present case does not present the factor related to the party's post-petition acquisition of claims. As to the other prerequisites of section 503(b)(4) (besides proof of a "substantial contribution"), the court finds Sanchez's claim meets the requirements of being (1) for attorneys' services; (2) reasonable compensation (subject to reductions in amount detailed below); and (3) allowable pursuant to Code § 330. Thus, the court need principally address the question of substantial contribution.

To begin with, Debtor argues that Sanchez acted as he did not for the benefit of creditors but merely in furtherance of his own claims. The trouble here is that Debtor fails to distinguish between the case where the "benefit" conferred redounds only, or overwhelmingly, to the applying creditor (and only incidentally benefits other creditors or constituencies)[26] and a more general benefit that is in the interests, to a greater or lesser degree, of all stakeholders in a debtor's reorganization.

In the case at bar, Sanchez relies on, in broad terms, three types of contribution. First, there is, of course, Davis's $400,000 commitment of capital to Debtor post-confirmation. Second, Sanchez points to other changes to the Plan (since its initial iteration) which either provide limitations on GEC's post-confirmation conduct or require GEC to take affirmative action to protect the stream of payments to creditors. Finally, Sanchez argues he has contributed by providing the monitoring and investigative functions normally performed by a committee appointed under section 1102 of the Code.[27]

The court holds that any of these accomplishments, attributable to the efforts of a party in interest, will, absent other factors, amount to a "substantial contribution in a case." *See* Code § 503(b)(3) (the prerequisite of which is adopted by Code § 503(b)(4)). It is self-evident that a significant increase in Debtor's available capital (here $400,000 in letters of credit) is a substantial improvement (and, hence, contribution) in the Plan which, through enhancing feasibility, makes return to *all* creditors more certain.

Likewise, if the protections added to the Plan benefit Sanchez, they also serve the interests of creditors generally. Because the limitations placed on GEC, Davis and others make

---

[26] *In re Lister*, 846 F.2d 55 (10th Cir. 1988); *In re Big Rivers Elec. Corp.*, 233 B.R. 739 (W.D. Ky. 1998).

[27] There was no committee in this case; thus the "duplication" present in *Mirant* (354 B.R. at 137) does not weigh against Sanchez here. Indeed, as discussed below, Sanchez's performance of functions that in another case might be duplicative weighs here, in the absence of any actual or potential duplication, in favor of granting the § 503(b) Application.

it more likely that the Plan will be carried out, the benefit from the limitations will be realized by all who look to the Plan for satisfaction of their claims.

As to Sanchez's contribution as a surrogate creditors' committee, Debtor argues that Sanchez was not a statutory fiduciary, the oversight performed should have been left to the United States trustee (the "UST") or the examiner and none of the irregularities cited by Sanchez led to any recovery for the benefit of creditors. In the absence of a creditors' committee, a chapter 11 case lacks the congressionally intended governor that would police a debtor's performance of its fiduciary obligations – yet the importance to the court and the system of monitoring and ensuring the performance by the debtor in possession of its fiduciary duties is no less in a case in which creditors do not organize a formal committee. Looking to the UST to fulfill that role is unreasonable. With limited resources and a great many cases to monitor, the UST is in no position to substitute for a creditors' committee. As in the case at bar, the UST at most can respond to concerns identified in the first instance by interested parties like Sanchez.

As to the examiner, first, there would have been no examiner but for Sanchez. Second, the examiner's duties and authority were severely constricted by court order. Finally, the examiner's two reports gave substantial support to the fears expressed by Sanchez.

As for Debtor's contention that no recoveries resulted from Sanchez's policing efforts,[28] section 503(b)(4), when incorporating section 503(b)(3)(D), unlike section 503(b)(3)(B), does not require a recovery "for the benefit of the estate [of] any property" (§ 503(b)(3)(B)) to justify compensation. Rather, section 503(b)(4), turning on section 503(b)(3)(D), requires a showing of "a substantial contribution in a case" (§ 503(b)(3)(D)). In the case at bar, identification of potentially voidable transfers to insiders may well have played a role in Debtor's decision to propose a plan providing for 100% satisfaction of all claims – and the possibility that failure to

---

[28] Although Debtor insists any reversal of any transfers during the case (e.g., return of money paid to Nordic and so reflected in Debtor's monthly operating reports) was not brought about by their identification by Sanchez, the court does not consider that contention any better proven than its converse.

Memorandum Opinion - Page 15 of 19

confirm a plan would result in pursuit of recovery of such transfers may have helped persuade Davis to enhance GEC's post-confirmation capital and so make the Plan feasible and confirmable. Moreover, because the Plan provides 100% recovery to creditors, pursuit of voidable transfers is, at best, likely to be uneconomic; at worst, complaints to recover voidable transfers in such a case might be subject to dismissal.[29] In any event, the benefit of any recoveries would inure to Debtor, not (directly at least) its creditors. Finally, potential causes of action based on voidable transfers will be preserved pending Debtor's performance of the Plan thanks to Sanchez.

In sum, for all these reasons Sanchez's policing of Debtor qualifies as a substantial contribution.

Debtor, however, argues that Sanchez's contributions are not compensable because they fail to meet the standards set by the Court of Appeals in *In re DP Partners, Ltd.*, 106 F.3d 667 (5th Cir. 1997). Debtor argues that Sanchez has not shown a causal connection between his counsel's work and any benefit. But as set out above, the court finds that Sanchez's efforts at least *contributed* to (1) Debtors' proposal of a 100% plan; (2) various protections and a capital infusion that make the Plan feasible; and (3) Debtor's attendance to its fiduciary duties. Debtor seems to be of the view that the causal connection of counsel's work to any benefit must be facially apparent, proximate and exclusive. The court does not find section 503(b) to be so

---

[29] Clearly, there is a question whether a preference may be recovered if creditors are satisfied in full. *See* 11 U.S.C. § 547(b)(5). While the trend in fraudulent transfer law favors permitting recovery in cases where creditors receive 100% satisfaction under a plan (*see, e.g.*, *Acequia, Inc. v. Clinton* (*In re Acequia, Inc.*), 34 F.3d 800, 809-10 (9th Cir. 1994); *Stalnaker v. DLC, Ltd.* (*In re DLC, Ltd.*), 295 B.R. 593, 605 (B.A.P. 8th Cir. 2003), *aff'd* 376 F.3d 819 (8th Cir. 2004)), the contrary view continues to receive support (*see, e.g.*, Gray Carlson, *Bankruptcy's Organizing Principle*, 26 Fla. St. U. L. Rev. 549, 580-83 (1990)). Moreover, the problem of proving a transfer to be fraudulent in a case of marginal insolvency, as presumably would exist in any chapter 11 where creditors receive full recovery, militates against pursuing such actions, especially where, as here, recovery would only indirectly benefit creditors. Finally, the possibility that the defendant in a fraudulent transfer action will have a claim back against the estate (11 U.S.C. § 502(d); Fed. R. Bankr. P. 3002(c)(3)) discourages prosecution of such actions in cases where a recovery of a transfer might lead only to a claim in like amount.

restrictive, but even by that standard, many changes in the Plan can be traced to specific objections made by Sanchez.[30]

It is also unlikely the court would have identified the Plan's infeasibility without the adversarial conduct of the confirmation hearing; thus, it was Sanchez's efforts that proximately caused Davis to put up additional capital, making Debtor's successful performance of the Plan much more likely. Finally, the court has been concerned throughout this case that Debtor lacked any great enthusiasm for the strictures imposed on its operations by chapter 11. For the court to insist on evidence directly proving that Sanchez caused Debtor to abide more carefully by the rules would essentially require Sanchez to prove a negative. Rather, the court is prepared to infer from the record before it that Debtor's conduct was better for Sanchez's monitoring.

Debtor's contention that Sanchez's efforts did not provide *general* benefit is similarly without merit. In this regard Debtor's argument that the court should consider acceptance of the Plan by all other creditors as proof that Sanchez acted only for himself is particularly misguided. That other creditors were apparently willing to run a significant risk that the Plan would prove infeasible does not mean those creditors were not benefited by changes to the Plan that greatly reduced that risk.

Debtor next argues that Sanchez has failed to show that the benefits he has brought to the case are worth the charges he now seeks to impose on Debtor's estate. *See In re DP Partners, Ltd.*, 106 F.3d 667 (5th Cir. 1997). The court does not agree. The product of this case is a feasible plan that will provide a 100% recovery to all creditors over a realistic time period.

---

[30] Paragraph ten of the Fourth Modification responds to Sanchez by preserving causes of action against the officers and directors or any insiders of the Debtor. Moreover, Sanchez's objections led to earlier changes in the Plan including: (1) monies taken from GEC for the benefit of Davis will be contributed back to the Debtor; (2) Debtor's ability to export business opportunities to affiliates is now limited; (3) the amount of compensation to Davis from the Debtor during the Plan payout period is now limited; (4) there will be borrowing controls on the Debtor during the payout period; and (5) Debtor must now provide regular accounting to outside parties. Also, Sanchez insisted on stronger default provisions in the Plan and increased jurisdictional oversight by this court during the payout period.

Sanchez played an important role in bringing about this result.[31] The amount sought by Sanchez — $194,644 — is reasonable,[32] especially in light of the costs of Debtor's counsel (in excess of $500,000). Further, total debt in this case exceeds $2,000,000; $194,644 is not an unreasonable charge for the role Sanchez played in ensuring that debt's full satisfaction.

Debtor further argues that much of the time of Sanchez's attorneys was spent on "routine" tasks. Routine work, Debtor maintains, citing *In re American Plumbing & Mechanical, Inc.*, 327 B.R. 273 (Bankr. W.D. Tex. 2005), should not be compensated under section 503(b)(4). However, what is "routine" legal work varies depending on the representation: "routine" work for a lawyer representing an unsecured creditor like Sanchez would include filing a proof of claim and resisting any objection to that claim. The services for which Sanchez seeks payment might have been "routine" if performed by counsel to a committee, trustee or indenture trustee. Undertaken by attorneys representing a single unsecured creditor, counsel's work was not routine.

For all the foregoing reasons, the § 503(b) Application should be granted. However, a review of the time records attached to the application persuades the court that the amount awarded Sanchez (or, as he has not paid them, more aptly his counsel; *see Mirant*, 354 B.R. at 140; *In re Western Asbestos Co.*, 318 B.R. 527, 530 (Bankr. N.D. Cal. 2004)) should be reduced.

First, some categories of charges do not represent work done in aid of any of Sanchez's substantial contributions.[33] Time spent on Sanchez's proof of claim and the claim estimation

---

[31] It is unlikely that a plan could have been confirmed if Sanchez did not receive 100% satisfaction. The absolute priority rule of Code § 1129(b)(2)(B)(ii) would ordinarily bar confirmation of such a plan that left equity in place over Sanchez's dissent. While *Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street P'ship*, 526 U.S. 434 (1999) leaves open the possibility of retention of equity in exchange for new value, that route was fraught with risk, especially given Sanchez's repeated expressions of interest in proposing his own plan. As Debtor had to satisfy Sanchez's claim in full, lest it risk facing the issue of unfair discrimination (section 1129(b)(1)), it had to satisfy all unsecured creditors in full.

[32] As discussed below, the fees sought by Sanchez must be reduced somewhat.

[33] The court appreciates the efforts of Sanchez's counsel to cull the § 503(b) Application. It means no criticism by further reducing the time included in the application.

process benefited only Sanchez. Likewise, correspondence between counsel and Sanchez was not helpful to creditors generally and brought to the estate—and the case—no value or advantage. Finally, review of other claims and analysis of the Plan's classification scheme was work that benefited only Sanchez.

Second, some of the charges included in the § 503(b) Application appear to be incorrectly calculated. For example, 2.3 hours billed by Clay Taylor on September 27, 2006, are charged at $963.50, or a rate of $418.91 per hour. The next day (September 28) 4.1 hours are billed for Mr. Taylor at a charge of (again) $963.50—or $235 per hour.

The court has therefore recalculated the amount to be paid by Debtor by reason of the § 503(b) Application by, first, deducting time spent on noncompensible categories and, second, multiplying the total hours for each attorney by that attorney's correct hourly rate.[34] The § 503(b) Application shall be granted to the extent of the resulting, lodestar amount: $172,900.50.[35]

The court's rulings as set out herein will be embodied in a separate order. However, the court understands there is no longer any need to maintain its original memorandum opinion under seal. The clerk of the court is accordingly ORDERED to unseal the court's original opinion as well as to docket and file that opinion as herein modified.

### ###End of Opinion###

---

[34] Those rates, are as follows: For Michael McConnell, $350/hour from the Petition Date through August 31, 2006, and $365/hour from September 1, 2006 through the date of this Memorandum Opinion; for Clay Taylor, $185/hour from the Petition Date through March 31, 2006, $225/hour from April 1, 2006 through August 31, 2006, and $235/hour from September 1, 2006 through the date of this Memorandum Opinion; for paraprofessionals, $125/hour and $140/hour; and a law clerk was billed at $150/hour. C.W. "Dub" Stocker, III, billed at a rate of $375/hour.

[35] In reviewing the time entries submitted by Kelly Hart Hallman LLP ("KHH") and Whitaker, Chalk, Swindle & Sawyer ("WCSS"), and taking into consideration the factors identified by the court above, the court determines that KHH should be awarded $113,200.50 and WCSS should be awarded $59,700 in connection with their respective § 503(b) Applications.